UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LOUIS MORGAN,

              Petitioner,       **DECISION AND ORDER**

    -vs-                 **No. 11-CV-6521(MAT)**

MARK L. BRADT, Supt.,

              Respondent.

---

## I.   Introduction

Pro se petitioner Louis Morgan ("Morgan" or "Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his detention in Respondent's custody. Morgan is incarcerated as the result of a judgment entered against him on March 10, 2009, following a jury verdict in Erie County Court convicting him of one count of second degree (intentional) murder (N.Y. Penal Law § 125.25(1)) and one count of second degree criminal possession of a weapon (N.Y. Penal Law § 265.03(1)(b)).

## II.   Factual Background and Procedural History

The convictions here at issue stem from the fatal shooting of Liquori Mills ("Mills") on August 17, 2007, at Michelina's Bistro on Pearl Street in the City of Buffalo. A summary of the pertinent trial testimony follows.

### A.   The Trial

#### 1.   David Szuba

David Szuba ("Szuba") is the brother of the owner of Michalina's. On the night of the shooting, a private party was being held to celebrate the eighteenth birthday of Brittney Parker

("Brittney"). The party had been arranged by Alex Parker ("Alex"), Brittney's brother. Scott Nowak ("Nowak"), who was friends the Szuba brothers, had introduced Alex to them. T.303-05, 495-96.[1]

Szuba arrived early with Nowak to set up the bar and music. T.305-06. Guests did not begin arriving until about 10:00 p.m. T.305-06. Szuba acted as the DJ that night, while Nowak worked the door checking I.D.'s, as he typically did. T.303, 314, 318, 321.

At 3:00 a.m., Szuba recalled, he was DJ-ing and Nowak was at the front door. T.315. Szuba heard "bam, bam, bam" and saw "a van go flying by the front of the bar with . . . [a] guy's hand still hung out . . . ." T.316. The man hanging out of the van was black. T.316. There was something in his hand but Szuba was not sure what it was. T.316. Szuba could not identify the shooter.

## 2. Brittney Parker

Brittney did not arrive at Michalina's until about 12:00 or 12:30 a.m. T.395. She was in the DJ booth when the shooting occurred. T.397. When she heard the shots, she ducked underneath the DJ booth and thus did not see the shooting at all. T.398. She did not know where Nowak, whom she knew as "Moe", was at the time of the shooting. T.410. According to Brittney, Nowak "was never working at the door, but if he was standing near the door, that [she] can't say." T.410. For a while, her cousin, Carmen Beasley ("Beasley") was collecting a cover fee at the door, but stopped shortly after Brittney arrived. T.419.

---

[1] Citations to "T.__" refer to pages from the trial transcript.

Brittney testified that she would have noticed if Nowak was standing at the door "a lot" but she did not "recall seeing him at the door a lot[,]" although she could not say that he was not at the door. T.411. She admitted that she was mostly dancing and making sure that the songs she wanted got played by the DJ. T.411. Brittney claimed that she only had one shot of Hennessy that night, although her brothers and her friends "kept trying to get [her] to drink all night. . . ." T.422-23.

### 3.  Eyewitness Jeffrey Lesanti

Jeffrey Lesanti ("Lesanti") went to Michalina's with his girlfriend, not knowing that a private party was being held there. T.369. The couple arrived about 1:00 a.m., finding the bar more crowded than usual and "rowdy" "like a mosh pit." T.370.  Lesanti and his girlfriend did not know the people who were throwing the party. T.371.

At about 3:00 a.m., while they were outside having a cigarette in front of the bar, the victim (whom Lesanti did not know) walked by them, went over to a nearby fence, and started urinating with his back to them. T.377. Lesanti then heard "two firecracker-type noises" which he recognized as gunshots. T.378. Lesanti pushed his girlfriend down out of the way and looked to his left where he saw that the victim had been shot twice in the chest. T.378. Lesanti looked to his right and saw a minivan (either a Dodge Caravan or Voyager). A black male "kind of hanging out [of the van's window]. . . with a snub-nosed revolver, . . . [was] pulling off the third shot." T.379. The shooter was firing "more backwards than straight

ahead." T.388. Lesanti testified that if the shooter had just moved his wrist slightly, he (Lesanti) would have gotten shot.

Lesanti looked back towards the victim and saw the third bullet go through his head, causing him to fall to the ground. T.379. Lesanti could tell that the victim was dead, so he attempted to see which way the van went as it drove away. T.380-81. Lesanti recalled that the lighting in front of the bar was very good due to the streetlights, the lights on the Michalina's building, and the lights from the surrounding businesses. T.383.

### 4.   Identification Witness Scott Nowak

At the time of trial, Nowak was working full-time as a mechanic doing collision work. T.476. However, in September of 2007, about a month after the Mills shooting, Nowak had been arrested for acting as a "look-out" while a friend of his went into a house and took some jewelry and money. T.476-77. A neighbor became suspicious and called the police, which resulted in the police apprehending Nowak and his friend. T.479. His friend, who was driving, got out of the car and ran away, while Nowak stayed behind and got arrested. T.480.

Nowak admitted that he had a criminal history dating back to his adolescence. Between the ages of nineteen and twenty-one, Nowak was arrested three times for driving while intoxicated and spent eighteen months in jail. T.481. He successfully completed a six-month rehabilitation program in 2003. From 2003 until 2007, things were going pretty well, but by the end of 2007, things had started to go downhill. That is when he was arrested in connection with the

burglary. Nowak testified that while he was at the holding center, he "asked to talk to somebody, because [he] had information about something that was on [his] mind, . . . , and [he was] trying to help [him]self a little." T.483.

Two detectives from the Buffalo Police Department's homicide bureau came to speak with him–Reginald Minor and Mary Evans. T.485. Nowak told them everything he knew about the murder of Liquori Mills. T.485. In particular, Nowak identified the shooter as "Lou" and provided several addresses where he knew Lou to stay. T.485-86. Nowak said that he was friends with Lou, and hung out with him "a bunch of times" in Depew and at houses on Humboldt and Northumberland. T.486-87. In addition, Lou used to hang out with Nowak and other friends every weekend at Michalina's. T.487. The group of friends included Heather Kretzman, who was dating Darawmus Gardner ("D"), Brittney's half-brother; Alex; Tone; and Lou. T.489. "Lou" also had been over to Nowak's house on two occasions. T.490.

 On the night of Brittney's party, Nowak went to Michalina's with Amanda Dolac ("Dolac"),[2] Amanda Lignos ("Lignos"), and Jeff Gervace ("Gervace"), arriving at about 9:30 or 10:00 p.m. T.496. Neither Tone nor Petitioner were there yet. T.497. Nowak was checking I.D.'s but someone else was collecting money for the party. T.499. According to Nowak, he was in the doorway "basically the whole night," and only left to use the bathroom or get a drink.

---

[2] Dolac testified at the grand jury and gave a statement to the police. However, she was not called by either side to testify at trial.

T.500. Nowak recalled that he saw Brittney come outside one time to cool off; she did not hang out by the door at all. T.502. Between 10:00 p.m. and 3:00 a.m., he had about six drinks and was "a little buzzed[.]" T.500.

Awhile before the shooting, Tone had commented to Nowak, "[W]e're scaring away all the white people, come hang outside so we can get people in here." T.511-12. From that time on, Nowak was standing in front of the bar with a group of people including Tone, Dolac, Lignos, D, and someone named Corey. T.513.

Nowak testified that at about 3:00 a.m., Tone said, "I would move out of the way if I were you[.]" T.515. The comment was directed at Dolac, who was standing closer to the alley on the side of Michalina's. T.515, 516. Nowak looked at Tone, who gave "a head nod towards the guy [Mills] that's taking a leak on the side of a building[.]" T.515, 518. Just then a van pulled up and Nowak saw "Lou hanging out of the side of the van shoot the guy taking a leak on the fence." T.515. Nowak heard three shots. T.519. The shooter was "facing back a little bit out of the window." T.519. According to Nowak, the van was a "gold/tan colored" Dodge Caravan. T.517.

After the shooting, Nowak left with Gerace, Dolac, and Lignos. He did not talk to the police or leave his contact information with anyone. T.522.

About a week afterwards, Nowak gave Petitioner, Tone, and Alex a ride home from Northumberland to Depew. Before they "even left the house, Tone and Petitioner told him, "[D]on't snitch." T.523. This made him "pretty nervous[.]" T.524.

Nowak admitted that he was testifying against Petitioner as part of his plea deal on the burglary charge, which also included requirements that he obtain and keep a job and continue with his alcohol-abuse counseling. T.524-25. At the time of the burglary incident, he also had a DWI charge pending from an arrest in June of 2007. T.538, 570, 573, 576.[3] Nowak could have received three to seven years, but as a result of the plea deal, he would receive a year of probation provided that he abides by the conditions placed on him. T.525.

### 5.  The Police Witnesses and Petitioner's Statements to Police

Detective Reginald Minor ("Det. Minor") and Detective Mary Evans ("Det. Evans") of the Buffalo Police Department's Homicide Bureau testified regarding their conversations with Nowak and Petitioner. Based upon information they gathered from Nowak in September 2007,[4] they requested that Petitioner speak with them about the Mills murder. T.778. Petitioner agreed to do so.

In his first statement, given on December 19, 2007, Petitioner stated he was not at Michalina's, knew nothing about the murder, and spent the entire night at home with his girlfriend, Kiontay

---

[3] Nowak resolved the DWI charge by a guilty plea on February 5, 2008. At the time he testified at Morgan's trial, he had not yet been sentenced. T.573.

[4]

Nowak provided names of Petitioner's associates and addresses he was known to frequent. Nowak also viewed a photo array containing Petitioner's picture and identified it stating, "That's fuckin' Lou." T.834.

Jackson. T.786. He claimed that he did not know Brittney, Alex, Gardner or Tone, and had never been to Michalina's. T.787-93.

About two hours after the first statement was completed, the officers told Petitioner that they did not believe him. Petitioner then gave a second statement claiming he initially did not tell the truth because he "didn't want to get involved." T.796. According to Petitioner, he went to Michalina's by himself at about 8:00 or 8:30 p.m. and stayed for five or ten minutes. T.796. He left because a person named "Bird" showed him a handgun which made Petitioner afraid that other patrons might have guns. T.797. Petitioner ultimately identified "Bird" as Daryl Henley, who had died earlier in December 2007. T.798.

Petitioner was allowed to leave after giving the second statement, but he later was arrested.

### 6.    Jailhouse Informant James Williams

James Williams ("Williams"), an inmate at the Erie County Holding Center ("ECHC"), testified for the prosecution but essentially recanted his earlier identification of Morgan as the shooter.

An Erie County-area native, Williams had a criminal record dating back twenty years and described himself as a "higher-up" in the gang, "the Bloods". Williams was incarcerated at ECHC because of a parole violation in connection with a South Carolina robbery conviction. Williams claimed that he did not need any help from law enforcement with his situation in South Carolina. T.595. However, unless he could come up with several thousand dollars in

restitution, he would face lifetime incarceration once extradited to South Carolina. T.596.

Between August 1, 2008, and August 13, 2008, Williams was housed with Petitioner at the ECHC in the same cell block. Williams explained that he and Petitioner were from the same neighborhood and knew the same people. T.605. Consequently, Williams asked Petitioner to help him obtain the money he needed to pay restitution in South Carolina. T.605. They "toyed around" with ideas for getting the money, such as selling drugs, "turning in guns to the city[,]" and so forth. T.606. Williams said that Petitioner made a "joke" about how he could earn money by being a "John Gotti" and making a witness disappear. T.606.

At first Williams did not take it seriously, but once he heard from other inmates he was possibly under investigation in connection with a murder-for-hire plot, he contacted the authorities because he was afraid of being accused. T.607-11. At trial, however, Williams maintained that he knew all along that it was merely a joke. T.611, 614. Williams admitted that he had never mentioned that he thought the conversations were a joke until the day of his testimony. T.613.

Williams met with the prosecutor on August 18, 2008, to discuss what Petitioner had told him. T.598. After viewing a copy of the nine-page written statement he had given at the District Attorney's Office, Williams claimed that he "really, really, really honestly, sincerely" could not "remember whether he said [Petitioner] was the actual shooter." T.599, 601. Williams denied

remembering that the prosecutor asked him if Petitioner had indicated whether he was the shooter. In his statement, however, Williams apparently said that Petitioner had told him he was the "trigger man". T.600.[5] Williams claimed that reading his statement did not refresh his memory. T.602. Williams did admit that there were two witnesses Petitioner wanted to "disappear"–one was white and one was black. T.622.

### 6.   Jailhouse Informant Richard Mullen

Richard Mullen ("Mullen") was in custody at the ECHC awaiting sentencing on his conviction by guilty plea in this Court (Arcara, D.J.) to participating in a continuing criminal enterprise ("CCE"). About two days before he entered his guilty plea, he had his attorney contact the authorities because he had information he wished to share about Petitioner's case and two other cases. T.716-17.

Mullen was expecting to receive 20 years for the CCE conviction and was hoping that by cooperating in Morgan's case, as well as the two other matters, he would receive a lesser sentence. He explained that the United States Attorney's Office had not made any promises in this regard.[6]

---

[5] Williams gave testimony on September 12, 2008. T.601.

[6] Leigh Anderson, Esq., Mullen's attorney, testified that the United States Attorney's Office had taken a "very strong stance" against Mullen and was not promising that it would do anything for Mullen, in spite of his cooperation with the Erie County District Attorney's Office. T.748. If Mullen were to receive credit for cooperating, the most he could hope for was a two-step reduction in his offense level under the United States Sentencing Guidelines. T.755-56.

According to Mullen, he first met Petitioner at the ECHC where they became friends and would talk almost every day. T.693. Mullen did not know anything about the Mills murder prior to speaking with Petitioner. Petitioner told Mullens that he and his friend, Tone, were at a club called Space,[7] and that Tone had a problem with someone at the club. T.694. Petitioner explained to Mullen that "Tone pointed out the guy that he had a problem with . . . [and] they got the gun and got in the car and came back and pulled up and shot the guy and then sped off." T.695. Petitioner also informed Mullen that he was the shooter, and that the police did not have the gun. T.696, 697.

### 7.   The Verdict

The jury returned a verdict convicting Petitioner as charged in the indictment on the charges of second degree (intentional) murder and second degree criminal possession of a weapon.

### B.   Post-Verdict Proceedings in State Court

On September 24, 2008, trial counsel was permitted to withdraw from representing Petitioner. The trial court directed the reassignment of substitute counsel, who filed a motion to set aside the verdict pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30.[8] Substitute counsel raised two claims-that trial counsel

---

[7] Space is located almost directly across the street from Michalina's. T.307-08.

[8]

The available grounds for relief under C.P.L. § 330.30 include "[a]ny ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court."

had been ineffective in failing to call Dolac as a witness and in failing to question certain prospective jurors about their ability to be impartial. The trial court denied the motion in an oral ruling. <u>See</u> Transcript of Proceedings dated February 19, 2009 ("2/19/09 Tr.") at 1-6.

Petitioner was sentenced on March 10, 2009, to an indeterminate sentence of 22 years to life.

Represented by the same attorney who had represented him in connection with the C.P.L. § 330 motion, Petitioner pursued an appeal to the Appellate Division, Fourth Department, of New York State Supreme Court. Petitioner's conviction was unanimously affirmed. <u>People v. Morgan</u>, 77 A.D.3d 1419 (4th Dept.), <u>lv.</u> <u>denied</u>, 15 N.Y.3d (2010).

### C.   The Federal Habeas Petition

This timely habeas petition followed in which Petitioner raises the following grounds for relief: (1) trial counsel provided ineffective assistance; (2) the verdict was against the weight of the evidence; (3) the trial court's denial of the C.P.L. § 330.30 motion without a hearing violated due process; and (4) his sentence violates the Eighth Amendment's proscription against cruel and unusual punishment.

For the reasons that follow, the request for a writ of habeas corpus is denied, and the petition is dismissed.

---

N.Y. Crim. Proc. Law § 330.30.

## III. Discussion

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat 1214, applies to Morgan's petition. When a claim asserted in a § 2254 petition has been "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), AEDPA reconfigures the standard of review by requiring "more deferential" review, Jenkins v. Artuz, 294 F.3d 284, 286 (2d Cir. 2002), of the state court's factual findings and legal conclusions. Messiah v. Duncan, 435 F.3d 186, 197 (2d Cir. 2006) (citing 28 U.S.C. § 2254(d)).

Because all of Morgan's claims cannot pass muster under a pre-AEDPA standard, they necessarily cannot provide a basis for habeas relief under the more stringent, post-AEDPA standard of review. See Messiah, 435 F.3d at 197 ("We need not determine here whether Messiah's claims were adjudicated on the merits by the state courts, thereby triggering AEDPA review, because his claims would fail even if we apply the less deferential, pre-AEDPA standard.").

### A.   Ineffective Assistance of Trial Counsel

Ineffective assistance of counsel claims are grounded in the Sixth Amendment right of criminal defendants to "the Assistance of Counsel," U.S. CONST. amend. VI, "a right which has long been recognized to guarantee 'the *effective* assistance of counsel[.]'" Greiner v. Wells, 417 F.3d 305, 318 (2d Cir. 2005) (quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970) (emphasis added in Greiner)).

-13-

The test for evaluating an ineffective assistance of counsel claim has two components. Greiner, 417 F.3d at 319 (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)). The performance inquiry examines the reasonableness of trial counsel's actions under "all the circumstances," Strickland, 466 U.S. at 688, from the perspective of trial counsel at the time, id. at 689. "Prejudice forms the second half of an ineffective assistance claim[,]" and requires showing that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Greiner, 417 F.3d at 319 (quoting Strickland, 466 U.S. at 694; other citation omitted). The habeas petitioner bears the burden of establishing both prongs of the Strickland test. Greiner, 417 F.3d at 319 (citation omitted). "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

### 1. Failure to Individually Question Certain Potential Jurors During Voir Dire

Petitioner contends that trial counsel was ineffective in adequately failing to question certain potential jurors (Derek Brifu ("Brifu"), Joan Ess ("Ess"), and Janice Struebel ("Struebel")) about their abilities to be impartial in light of the fact that they had family members or acquaintances who worked in law enforcement.

Brifu stated that he had a friend who was a state trooper in Virginia and friend who was a Secret Service Agent. T.80. The trial court asked Brifu, "[H]ow do you feel about evaluating police testimony as compared to non-police [testimony]?" T.80. Brifu replied simply, "Impartial." T.80. Brifu was seated as a juror.

Ess's deceased father had been a police officer in Buffalo, her husband worked for the Erie County Sheriff's Department in the civil division, and her uncle had been the Erie County Sheriff many years ago. T.115. When asked whether the testimony of law enforcement witnesses would "present[ ] any problems or issues for [her] regarding fairness and impartiality[,]" Ess responded, "No, I can be fair." T.116. Ess was seated as a juror.

Struebel had a son who was a New York State Trooper and other relatives who were police officers. Neither the trial court nor defense counsel questioned Struebel about her opinions vis-a-vis the testimony of law enforcement witnesses. Struebel was sworn as an alternate juror.

The Appellate Division found that the failure to ask further questions of these potential jurors was a tactical decision entrusted to defense counsel and not subject to the personal veto of Petitioner. People v. Morgan, 77 A.D.3d at 1419-20 (citations omitted). This holding was not an incorrect application of federal law.

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair

hearing violates even the minimal standards of due process." Irvin v. Dowd, 366 U.S. 717, 722 (1961). If a juror expresses some reservations about his ability to be impartial, as long as the juror later expresses during voir dire that he will try to decide the case based on the evidence presented, that assurance will generally be sufficient for both the attorney and the court. See United States v. Towne, 870 F.2d 880, 885 (2d Cir. 1989) (trial judge did not abuse his discretion in failing to excuse potential juror for cause because she expressed reservations about her ability to be an impartial juror and knew of defendant's criminal history and had read media accounts about him, where trial judge elicited a promise that she would try to decide the case based on the evidence presented).

Here, neither Brifu, nor Ess, nor Struebel expressed any reservations about their abilities to be impartial. Instead, they each asserted unequivocally that they could be impartial and fair. Petitioner thus has failed to demonstrate that he was prejudiced by trial counsel's failure to question these jurors further. See Black v. Goord, 419 F. Supp.2d 365, 381 (W.D.N.Y. 2006) ("The Court has searched the record and cannot find that, based on any of the juror's responses on voir dire, there was the 'actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' Irvin, 366 U.S. at 723, 81 S.Ct. 1639 (internal quotations and citations omitted). Thus, Black cannot establish that he was prejudiced by trial counsel's failure to question them more vigorously about their attitudes concerning

individuals involved in law enforcement."). Moreover, Petitioner's contention regarding Struebel is moot because, although she was seated as an alternate, she ultimately never deliberated on Morgan's case. See Towne, 870 F.2d at 885 (defendant could not demonstrate that he was prejudiced by the trial judge's refusal to excuse a venireperson for cause where she was never a member of the jury that convicted him).

### 2.    Failure to Call a Witness

Petitioner also faults trial counsel for failing to call Dolac, the friend of Nowak's who was standing with him at the time of the shooting. According to Petitioner's appellate counsel, Dolac "could have rebutted and seriously undermined" Nowak's testimony. Petitioner's Appellate Brief ("Pet'r App. Br.") at 16. The trial court held that not calling her was "strategic forbearance[,]" 2/19/09 Tr. at 5, on counsel's part. The Appellate Division agreed, holding that there were legitimate reasons for defense counsel's refusal to call Dolac since, in addition to providing some exculpatory evidence in her grand jury testimony, she also provided testimony to corroborate Nowak's testimony. This holding was not an incorrect application of federal law.

The decision "whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987), cert. denied, 484 U.S. 958 (1987); see also United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002), cert. denied,

538 U.S. 1021 (2003). If an attorney's decision not to call a
witness is reasonable, it cannot amount to ineffective assistance
of counsel. See Sacco v. Cooksey, 214 F.3d 270, (2d Cir. 2000)
("Representation is ineffective if 'counsel's representation fell
below an objective standard of reasonableness.'") (quoting
Strickland, 466 U.S. at 688).

The Court has reviewed Dolac's grand jury testimony and it was
evident, from the prosecutor's comments, that Dolac was a reluctant
and somewhat uncooperative witness.   According to Dolac's grand
jury testimony, she was outside having a cigarette at the time of
the shooting, and the only person she recognized in the group
standing outside was "Tone". Id.

    Q:   [I]n addition to Tone, who else was out there with
         you?
    A:   No one.
    Q:   No one?
    A:   Well, there was people around me.
    Q:   Okay. Who else was out there? Whether they were
         with you or not, who else was out there? Scott
         Nowak out there?
    A:   No. He was in the bar.
    Q:   He was in the bar you are telling us?
    A:   Yes, he was in the bar.

See Grand Jury Testimony of Amanda Dolac ("Dolac Test.") at 23. As
Petitioner points out, this directly contradicts Nowak's testimony
that he was outside the bar standing very close to Dolac at the
time of the shooting.

However, as the trial court and the Appellate Division noted,
Dolac also provided evidence corroborating Nowak's testimony. Her
statement to the police notes that "Dolac recalled Scott [Nowak]
saying he heard Tone saying something weird, that he thought he

-18-

heard Tone singing a song" just before the shooting. Police Statement of Amanda Dolac ("Dolac Stmt.") at 2. This contradicts her grand jury testimony that Nowak was not outside were her and Tone. In addition, Dolac testified before the grand jury that before shots were fired, Tone said to her, "[Y]ou should go in the bar." Similarly, Dolac asserted in her statement to the police that moments before the shooting, Tone told her "she had better go in the bar." These aspects of Dolac's evidence corroborate Nowak's testimony that just prior to the shooting, Tone made a comment to Dolac to the effect of, "I wouldn't stand there if I were you."

As the trial court aptly noted in its ruling denying Morgan's C.P.L. § 330.30 motion, Dolac was "a loose cannon for whomever called her[.]" 2/19/09 Tr. at 5. In addition to the possibility that she would have "flip[ped] on the other side[,]" id., the prosecution could have cross-examined her about her earlier statements suggesting that Nowak was outside in front of the bar as he had claimed. Id. In light of these factors, trial counsel made an objectively reasonable strategic decision to refrain from calling her. See Greiner, 417 F.3d at 323 ("[D]eference to [counsel's judgment] is particularly apt where, as here, an attorney decides not to call an unfriendly witness to the stand and has precious little means of determining how the witness might testify."); Sacco, 214 F.3d at 274 ("[T]he uncalled witnesses were, themselves, highly impeachable. They had either drug habits or criminal histories, and all also had strong motives to lie for Sacco. For trial counsel to decide not to put on these witnesses,

when Armento's impeachment both on similar and on other grounds had already been attempted by counsel and when those very witnesses were themselves impeachable, and could even be described as willing to perjure themselves, was reasonable.").

**B.   Failure of Trial Court to Hold Evidentiary Hearing on C.P.L. § 330.30 Motion**

Petitioner contends that the trial court deprived him of his right to due process by failing to conduct an evidentiary hearing in connection with his C.P.L. § 330.30 motion. The Appellate Division held that the trial court did not abuse its discretion in denying the motion without holding a hearing. People v. Morgan, 77 A.D.3d at 1420 (citation omitted).

A C.P.L. § 330.30 motion may be resolved without a hearing to determine questions of fact if "(i) [t]he moving papers do not allege any ground constituting legal basis for the motion; or (ii) [t]he moving papers do not contain sworn allegations of all facts essential to support the motion." N.Y. CRIM. PROC. LAW § 330.40(2)(e)(i)-(ii). Notably, Petitioner's substitute counsel did not request a hearing in his C.P.L. § 330.30 moving papers, simply asking for an order setting aside the verdict and for such other relief as was just and proper. In addition, the C.P.L. § 330.30 motion did not contain sworn allegations of fact, thereby providing a basis for the trial court to deny the motion without a hearing. See Dexter v. Artus, No. 01-CV-237, 2007 WL 963204, at *10 (N.D.N.Y. Mar. 27, 2007) (where trial attorney stated that his C.P.L. § 330.30 motion was brought on hearsay allegations, and

motion did not contain sworn allegations of fact, trial court's refusal to conduct evidentiary hearing was in compliance with state statutory law). The procedure set out in C.P.L. § 330.30 "is not constitutionally deficient." Id. (citing Rodriguez v. Hoke, 89 Civ. 7618, 1990 WL 91739, at *2 (S.D.N.Y. June 25, 1990)). Finally, as this Court has determined, the trial court correctly resolved the C.P.L. § 330.30 claims without a hearing.

### C.   Verdict Against the Weight of the Evidence

Petitioner contends, as he did on direct appeal, that the verdict was against the weight of the credible evidence. The Appellate Division disagreed, noting that the jury was aware that one of the witnesses (Williams) was a jailhouse informant and another (Mullen) was hoping to receive a favorable treament with respect to a different criminal matter in exchange for his testimony against Morgan. The Appellate Division "perceive[d] no basis to disturb the jury's credibility determinations[.]" People v. Morgan, 77 A.D.3d at 1420 (citations omitted).

A "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute, see N.Y. CRIM. PROC. LAW § 470.15(5), whereas a legal insufficiency claim is based on federal due process principles. People v. Bleakley, 69 N.Y.2d 490, 495 (1987). Because Petitioner's weight of the evidence claim implicates only state law, it is not cognizable in this federal habeas proceeding. See 28 U.S.C. § 2254(a); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (habeas corpus review is not available where there is simply an alleged error of state law). Therefore,

Petitioner's claim is dismissed as not cognizable. <u>See</u>, <u>e.g.</u>, <u>Scission v. Lempke</u>, 784 F. Supp.2d 237, 243 (W.D.N.Y. May 16, 2011) (dismissing habeas petitioner's claim that the verdict was against the weight of the evidence as not cognizable because it raised solely a question of state law) (citations omitted).

### D.   Sentence in Violation of the Eighth Amendment

As his fourth ground for relief, Petitioner contends that his sentence of 22 years to life, for a crime which he allegedly did not commit, constitutes cruel and unusual punishment. This claim, which is based on the Eighth Amendment, is unexhausted because on direct appeal, Petitioner requested only that the Appellate Division exercise its statutory authority to reduce the sentence on the basis that it was harsh and excessive. Having never been fairly presented to the state courts in federal constitutional terms, the Eighth Amendment claim that Petitioner now raises is unexhausted. <u>E.g.</u>, <u>Bester v. Conway</u>, 778 F. Supp.2d 339, 348-49 (W.D.N.Y. 2011) ("This Court and other courts in this district have found that a prisoner's reliance on a state procedural law granting courts discretionary authority to reduce sentences does not "fairly present" his/her constitutional claim in state court.") (citations omitted). Because Morgan could return to state court and file a motion pursuant to C.P.L. § 440.20 to set aside the sentence on the ground that it is unconstitutional, his Eighth Amendment claim remains unexhausted. <u>Id.</u>

The Court now has the discretion to dismiss the petition on the merits notwithstanding his failure to exhaust his Eighth

Amendment claim. See 28 U.S.C. § 2254(b)(2); Pratt v. Greiner, 306 F.3d 1190, 1197 (2d Cir. 2002). Because it finds all of Morgan's claims to be without merit, Morgan's failure to exhaust the Eighth Amendment claim does not preclude this Court's disposition of the instant habeas application.

The United States Supreme Court has articulated a narrow principle of "gross disproportionality" for measuring whether a prisoner's sentence violates the Eighth Amendment proscription against "cruel and unusual punishment." E.g., Harmelin v. Michigan, 501 U.S. 957, 998 (1991) (Kennedy, J., concurring in part and concurring in the judgment). The "gross disproportionality" principle finds sentences disproportionate to their crimes only in the "exceedingly rare" and "extreme" case. Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks and citations omitted); see also United States v. Snype, 441 F.3d 119, 152 (2d Cir. 2006) (noting that successful challenges to the proportionality of particular sentences have been exceedingly rare).

Here, the maximum sentence Morgan could have received, as a first-time felony offender, was 25 years to life for his conviction of intentional murder. Instead, he received concurrent sentences, the longest of which was 22 years to life on the murder conviction. Given the relevant Supreme Court precedent, this case clearly does not present one of those rare and extreme cases in which the Supreme Court contemplated intervention by a reviewing court into a state's sentencing decisions. See, e.g., Harmelin, 501 U.S. at

994-95 (on direct review, holding that imposition of mandatory sentence of life in prison without possibility of parole, without any consideration of mitigating factors, such as the fact that petitioner had no prior felony convictions, did not constitute cruel and unusual punishment under the Eighth Amendment). Accordingly, Petitioner's claim that his sentence violated the Eighth Amendment cannot provide habeas relief.

## IV. Conclusion

For the foregoing reasons, the petition filed by Louis Morgan (Dkt. #1) is dismissed. Because Morgan has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3) and FED. R. APP. P. 24(a)(3), that any appeal from this Decision and Order would not be taken in good faith and therefore the Court denies leave to appeal as a poor person. See Coppedge v. United States, 369 U.S. 438, 445-46 (1962).

Any application for leave to appeal in forma pauperis must be made to the Second Circuit Court of Appeals in accordance with FED. R. APP. P. 24(a)(1), (4), & (5). See id. Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.

**SO ORDERED.**                   S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     Rochester, New York
           August 13, 2012